Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC May it please the Court, Counsel. My name is Michael Coyle. I represent A-S Medication Solutions. We didn't get our day in court at the district court level. We believe that a summary judgment motion was improvidently granted. We're going to ask that you reverse that and send it back to court so we can have a trial on these issues. This is a TCPA case, but this isn't going to be about somebody getting a fax for a trip to Cancun or your student loans aren't paid. A-S Medication Solutions sent these fax to its customers. A-S Medication Solutions is a company that provides pharmaceutical dispensing services for thousands and thousands of physicians across the United States who have their own The state-of-the-art in 2010 when these faxes went out with these doctors' offices is that there weren't encrypted emails and that we routinely sent fax information back and forth between these doctors' clinics to provide them with the services that they signed up for. We believe that we had expressed permission and consent to deal with these doctors' offices, that this is a very unusual case in the context of a TCPA because we're dealing with our own customers. And in this case, the pharmacy information that we're sending back and forth to these doctors is TIPA-protected in some cases. It involves the ability of people in these doctors' offices to actually dispense medications, its contracts, its forms, and had we given the opportunity, the evidence in the case would have shown that we had to Pursuant to the TCPA to be subjected to liability, the fax that is sent must be unsolicited. A fax is unsolicited if it is sent to persons who have not given their prior express invitation or permission to receive it. If the fax is not unsolicited, it doesn't need to have an opt-out notice. Now the first issue I want to talk about is, again, I believe that district court improvidently granted summary judgment on liability. In order to overcome summary judgment, we had to show two things. We had to show that we had prior express consent or permission from our customers to send them a fax, which we believe we showed. And the second issue is, is AS Medication bought this business on a complete asset purchase from a company called Allscripts, but we went right into their office. It was the same company, the same employees, the same customers. Now, we never got to the second issue because the court, we believe, put a heightened burden on us in our summary judgment. We provided more than ample evidence of material fax. We thought we were going to have a trial, but we didn't get to it. The court disregarded the affidavits we submitted as insufficient and too thin. Now, I have in my hand one of the affidavits we submitted, and it was from one of the doctor's group, the Family Wellness Center. And they said, we gave Allscripts permission to send us faxes, and we consented to AS Medication to send us information and our case and other affidavits from Allscripts before us. The district court described the affidavits as insufficient or too thin. The court held that prior, held a prior express permission defense as insufficient as a matter of law, even when the recipient expressly consents to receiving information like we have here. Well, that was, you didn't have that for everyone, obviously. Well, Your Honor, this is just one example. Yeah, well, one example, but I don't know, how many did they send out? I think that we put in a total of, oh, how many different faxes did we send out? I think the total was 11,422. Yeah. But again, as far as proving a material issue of fact that affected the class, we produced more than sufficient evidence that we should have gotten to the court and had a trial on this issue. Was that an implied, what you used as a basis, it implied that all these people consented? No, she says I consented. It's just that one, sir. This particular one. Yeah, all right. This particular fax is I actually consented to receive this information from not only Allscripts, but from our client. Okay. And we believe that was sufficient to get to the jury. But you don't have that for whatever, many thousands. Oh, no, Your Honor. That's all I'm saying. Is that implied that everybody got the same information? Well, I think that it was as far as the summary judgment was concerned. I think it entitled us a key to get to the jury and have them decide this issue. Because I think the problem is on these TCPA cases, what's so unusual about this is this isn't a spam or something that's clearly unsolicited. What makes this case so unique and why we are entitled to our day in court is these are our customers. These aren't people who we're just picking out of thin air. These are customers who consented. We're sending them pharmacy information. Remember, when you go get a prescription filled, if a doctor's running his own pharmacy, it's no different than going to Walgreens. You have to have adjudication, contraindications, co-pays, software. We provide all that information. And in this case, we never got a chance to tell our story because under the TCPA, the issues. Now, the applique argues that this case's Holtzman number one is binding on this issue. And they cite Holtzman one, which erroneously states that an opt-out notice is required when a fax is sent with prior express permission or invitation. It's contrary to the TCPA, and it's contrary to this court's decision in Brodsky. Second, this Holtzman case never determines whether prior express permission or invitation was ever given. It relied solely on the opt-out provision. And third, the sole issue in Holtzman was whether the subject faxes contained advertisements. And here, Your Honor, there's no dispute. In this case, they were ads. But we believe we had our long-standing relationship, the ability to send them this information. Now, the facts that support prior express invitation or permission that was submitted to the district court is they always, all scripts we bought the business from. And again, I think it's important to understand this is no different than Walgreens one day and Walgreens LLC the next. We're the very same company. They always had their customers' permission to send them an advertisement via fax. This was their policy. And in addition, they had a software called Salesforce where customers can provide their fax number and then give information whether they want to receive faxes or they don't receive faxes. We believe that there was more than sufficient evidence in the record that our customers gave us permission to send them faxes. Now, the fax in this case is actual adjudication software that pharmacists use to determine co-pays when their patients come in. So again, it's not selling toner or trips to Cancun or retire your student loans. These are our customers. Now, the second thing we needed to approve was that we stepped into all scripts' shoes. We purchased their medication business, all their advertising, all their sales and purchase correspondence, all their customer information, their database, their trademarks. We assumed all their assets and liabilities. And listen, when you buy a company, what's the one thing you're going to buy from them? I mean, they're customers. It was a critical part of the transaction. And we got not only AS Medication, our clients, to submit affidavits. All scripts' former customers signed affidavits saying, hey, we considered AS Medication to be the same thing as all scripts. Now, Apple is going to argue that, well, it's all silent on transfer. It's all what? That there's no, as far as the information, the transfer, the actual consent. But again, we're purchasing the entirety of the business. They haven't really come up with an argument that we didn't rightfully acquire the right to communicate with the customers who are the subject of this business. So, Your Honors, I believe that the district court put a heightened standard on us, that we were entitled to come in and show that this is an arm's length transaction business, that we're communicating with these doctors groups nationwide, and the evidence will be that there's 20 to 30 faxes because that was the state of the art in 2010. And we just never got our day in court. Now. Mr. Coyle, would you agree that the TCPA doesn't expressly talk to the transfer issue? I would agree with that, Your Honor. But I also agree that this is how business is done in this country. And we didn't buy them for their building and the fact that they have prescriptions. We bought the lock, stock, and barrel. I understand that. But it's a consumer protection legislation, so we normally liberally construe that. I understand. And I think that in situations you could, if it was somebody else that was buying them. But we just stepped right into their shoes. It was a seamless. They were our customers. These are physicians. They're running pharmacies and their doctor's practices. We didn't get our day in the courthouse. And we're entitled to it. And I'm going to ask that you send this case back so we can tell our story. And I think this needs to be heard by the finder of fact. Now, two other things. If you decide that you're not going to send it back for trial, and I think we're entitled to one, remember they never proved their damages. Now, you asked a question, Your Honor, about there was 11,422 faxes. That's correct. But we put in an expert's affidavit that there was associated with 62,000 NPI numbers. And an NPI number is for a national number that Medicare and Medicaid puts out for pharmaceutical. So here's the problem that they have, because this is not Terza. In Terza, there was 425 faxes, 425 people that got the faxes, and they got a whole pile-up, 425 people here in Chicago. In this case, the fax target, it could be Dr. McGillicuddy, who's running the pharmacy, but there could be six different doctors in that office. Now, one thing I do know, that there's a difference between us. They have the burden of proof, and they never proved who the person who is entitled to the $500 is, whose fax machine it was, whose toner it was, whose ink it was, and they didn't prove that. And I think it's fatal to their claim, because the burden of proof of damages is always on the plaintiff, and in this case, it didn't happen. Now, does it matter when somebody gets a fax, what kind of damage that is? Is that what you're worried about? No, Your Honor. I think the difference is there's a difference between the target of the fax and who actually sustained the damage. If there's six physicians at— Well, I don't know where the $500 goes. That's baffling to me. I'm just saying if they get this kind of $500, is it just everybody who received it automatically gets $500, even though they threw whatever they got in the wastebasket? That's the problem. That's their burden. But is that the law? Well, the problem is there's a difference between the target of the fax and the recipient, the person who sustained the damage. In Terza, it wasn't an issue, because you knew exactly who it was. They argue that Terza's applicable here. It couldn't be farther from Terza. There's 62,000 doctors out there, and what the district court said is, well, send a $500 check to every 11,422. Here's the problem. Who's going to get the money? The simple fact is that that was their burden, and they didn't prove it. So if you're not going to give me a trial, which I'm asking you to do, then it has to go back and have an evidentiary hearing at a minimum on the issue of who gets the money, because that was their burden of proof and they didn't comply with it. They don't care. They just want us to send out 11,422 $500 checks, and they don't care who gets them. But that burden is on them. The money needs to go to the person who actually sustained the damage, and they didn't comply with their burden. And that brings me to what happened in this case is that things started happening quick. The judge entered judgment in August, and then he said, this case is going to be off my docket in December. Well, it was. And they submitted 2,000 pages of material about who gets these checks on their motion for money damages on Thanksgiving. And the following Tuesday, when we asked for leave to submit a cert reply, the judge says, well, you're too late. We were prejudiced, and we were entitled to submit evidence and respond to that, because once the judge entered judgment on the liability, summary judgment on liability, he almost immediately switched to this damage phase, and we're entitled to respond to that. The last issue is it goes to this distribution plan, and I think it dovetails back to the 11,422. This is not terza. We're not asking people to swear they got the fax or consent to the attorney's fees. We need to send a fax out to say, did you get this fax? Were you the person of the 60,000 that received it? I think I'm running out of time here. I'm going to sit down. Thank you. Thank you, Mr. Carlton. Mr. Harrah? Thank you. May it please the Court. My name is Glenn Harrah. I represent the appellees, Physicians Health Source, Inc., and the certified class. The three orders under review should be affirmed. We're talking about the district court summary judgment on liability, the order entering judgment for $5.7 million, which is a mechanical calculation of $500 in statutory damages times the 11,418 TCPA violations, and the third is the order partially granting the plaintiff's plan for distribution of the money. The district court left some things undecided in that order, as we'll discuss later, I'm sure. But the district court, Judge Canelli, carefully considered all of the defendant's arguments on each of these orders, and it held that those arguments were inconsistent with the Holtzman line of case. It's Holtzman v. Terza. So that's Holtzman 1, Holtzman 2. There were two published decisions in the Holtzman trilogy, and then Holtzman 3, which is unpublished but highly instructive, obviously, given that it's a Holtzman case is a case like this case, a TCPA class action where the class is certified, the case, for whatever reason, does not settle, and it goes to a determination on the merits. It was decided at summary judgment, just like this case was decided at summary judgment for the class. So if there's a violation, it doesn't matter how many people got it. It's based on one violation, even if there are six people who looked at whatever went wrong. Correct. The damages are per violation. It's $500 per unsolicited advertisement sent to a telephone facsimile machine. Yeah, well, I have a problem with the damages. Maybe that's just too bad. This court has previously observed the damages are what they are. You could disagree with them from a policy perspective. Some people would say the damages are draconian, they're too high. Some people would say they're too low. You know, people hate getting calls on their, you know, robocalls on their cell phones. They would say it shouldn't be $500 per call. It should be capital punishment. Is there one on robocalls at all? It's the same statute, Your Honor. Is it really? The Telephone Consumer Protection Act covers calls to your cell phone. You get three a day. That's what I wondered. You get three of those a day. Well, it's oftentimes, in the fax context and the call context, hard to figure out where it came from. If you want to listen to the whole thing, yeah, I suppose you'd find out. I mean, who do you recover from, even if you can? I mean, there's a science and kind of an art to it. But in this case, it was easy because it says it's A-S medication, and we have this great new product for you. We're formerly Allscripts, but now we have this new software, Pedigree RX, you know, software program that we'd like you to use. So it was easier in this case. I want to note, because we didn't talk about it, what is not before the court in this appeal, and that is class certification, Judge Gottschall's order certifying the class in this case under Rule 23b-3. And that's significant because it means the defendant is not contesting a few things, one, that common issues predominate over any individual issues, and two, that a class action is the superior way to decide this case, that it's manageable to decide all of the class member's claims in one fell swoop. That concession is fundamentally inconsistent with A-S's argument that you can't enter a judgment based on the purely mechanical calculation of the number of violations times the statutory damages amount unless you identify each class member, unless you identify who's going to get each, you know, portion of the $500 check. That is really a backdoor argument against class certification, but they're trying to sneak it into a de novo review instead of the abusive discretion standard that would ordinarily apply on class certification. It's also reminiscent of the old ascertainability arguments that used to come up that this court dispensed with in the Mullins v. Direct Digital decision in 2015. Those arguments about, well, do you have to identify the class members before certification or do you have to propose an administratively feasible way to identify them? And what this court clarified in Mullins was there is no freestanding ascertainability requirement. Any of those concerns, how do we give notice to the class, how do we pay out any recovery if there is one, those are concerns under manageability, which is one of the factors that goes into Rule 23b-3 superiority. So it's in some sense what 8-S is trying to do here is just undermine the class certification and come up with a rule that, yes, you can certify a class in a TCPA case as long as the class doesn't win, as long as you don't actually enter judgment on their behalf and try to send them the money. As to the summary judgment on the merits, my colleague admitted they're not disputing anymore that it's an advertisement, that the facts, we're talking about one fax, by the way, it was sent to 11,422 fax numbers, but it's one template, one advertisement that was sent to that many numbers. And so the only element they're disputing here is prior express invitation or permission. The district court applied the FCC's standard for what that means. It's in the 2003 order. In appendix page 9, Judge Cannelli quotes it. It says, express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements. It's not enough, close quote, it is not enough that the recipient say, yeah, you can send me information, or, yeah, I consent to you sending me a fax. You have to get their permission to send them advertisements, and that's important because once you get that permission, you can keep sending them over and over again. So it really is important that the, and the FCC is also quite clear that it is the sender's burden, and the defendants don't dispute this here, it's the defendant's burden of proof to prove that they obtained that express permission to send that fax. And that's, the FCC gave several reasons for that, but that's because they're in the best position to have that information. You can't send out thousands of fax advertisements and then say, well, we had permission to do it, so you can't, you know, so you lose or you can't certify a class. The sender has the obligation to maintain that evidence. It doesn't have to be in writing, but you do have to promptly document it in some way, so that if you're challenged in the future, you can prove that you met your obligation to obtain the consumer's prior express permission. So Judge Cannelli carefully considered the four types of evidence that the defendants put forth to carry their burden on prior express permission. They had the testimony of Brian Moffitt, who's an Allscripts employee, who said, well, we had, you know, we always got permission, of course we always got permission to send faxes, but when you look at his testimony, what he was talking about was one-off faxes, such as, like, disaster preparation or messages about data integrity. He wasn't talking about, you know, sending fax advertisements to Allscripts customers. The main claim is that everybody in this class, including Physicians Health Source, is listed in the Allscripts Salesforce database. That's a customer, you know, a customer management database that Allscripts used. Is that part of the purchase agreement? Do they refer to that? Yes, yes. But, you know, you can't – the first step is, did Allscripts have prior express invitation or permission? That's the first question. And then the second question would be, if you answered that in the – The secondary question, and what we would ask the court to affirm on an alternative basis, is that even if Allscripts had prior express permission, it can't transfer it to A-S. You can't buy express permission from somebody, because express permission means, as the FCC held in the 2006 order, that you are – sorry, right, it's in the 2006 order. And the district court quotes it. The sender – this is quoting from the FCC's 2006 order, and the FCC's interpretations of the TCPA are binding in this court. This court held that in CE Design versus PRISM. In private TCPA litigation, they're controlling. So the FCC held that the sender must obtain the prior express invitation from the consumer, and that's what Judge Connelly relied on here. He didn't hold it. He observed that it appears that under the 2006 order's plain language, it would appear A-S solutions and HOTH cannot avail themselves of the prior express consent defense. But he held that he didn't need to reach that transferability question, because the defendants hadn't shown – hadn't created a genuine issue of material fact on whether all scripts really had prior express invitation or permission. Have we ever, Mr. Harra, expressly considered what constitutes sufficient evidence of express permission at the summary judgment stage? The defendant in Terza raised that argument. He argued you can't enter summary judgment against me because there's a genuine issue about whether some of these class members consented, because they're my students. He was an attorney, and I think he taught some classes. They're my students. They're my clients. And then he also got some numbers from a CPA organization, a certified public accountant organization. But he said you can't enter judgment against me because there's a question of consent as to some of these class members. And this court said regardless of whether you have consent due to these business relationships, your faxes lack the compliant opt-out notice. So it doesn't matter if you had consent or not. Now – It lacks what? It lacked opt-out notice. So the statute requires that an unsolicited fax advertisement – you can send an unsolicited fax advertisement under the TCPA under the Junk Fax Prevention Act of 2005. Defense counsel said this case is really unusual and really unique because they're sending fax advertisements to customers, well, to ADASHF's customers. First of all, that's not true in every case. My client was never a customer of ADASHF's. They were a customer of Allscripts for a time, which is why they have this derivative claim that Allscripts had permission and we purchased the permission from Allscripts. But it's also not unique, and it's not unusual. So you're suggesting you have a derivative claim, but they can't rely on the purchase of the company. A derivative claim. Didn't you just say your client has a derivative claim? No. I'm saying the defendant's prior express permission defense is derivative. They're relying on – they're saying Allscripts got permission, and then they transferred it to us when we bought them. Our claim is direct. Physicians HealthSource Inc. received their fax advertisement. But it is not unusual or unique for companies to send fax advertisements to their customers. That's why Congress enacted the Junk Fax Prevention Act of 2005. That's codified in 47 U.S.C., Section 227B1C, and then there are small Roman numerals 1 through 3. And Congress created this safe harbor or this exemption in there for situations where – and it's tailor-made for this situation – for situations where, one, there is an established business relationship between the sender and the recipient. Two, there is the voluntary communication of a fax number from the recipient to the sender. And three, the fax contains a compliant opt-out notice telling the recipient how to avoid future fax advertisements. If you comply with those three, you can send unsolicited fax advertisements. You just have to tell people how to make them stop. And what happened in Terza was the defendant said, I had consent from everybody, and this court interpreted that kind of implied consent where you say, well, they're his customers. Maybe they wouldn't mind receiving fax advertisements from him. That's what Congress did. It said, yeah, we're going to infer a certain general level of consent here, and we're going to say you can send fax advertisements to your customers, but you have to tell them how to make the faxes stop in case they don't want them anymore. And that's what A-S didn't do here. A-S used no opt-out notice whatsoever. It's not a case where there's a noncompliant opt-out notice or, you know, it's a question about whether some technical requirement is met or not. There's just nothing in there. There's no way to make these faxes stop. Is this opt-out notice open-ended? Like, after you get about three or four of them, you say, I've had enough of this. Is that an opt-out if you got that in the file? I don't understand why the opt-out works. The opt-out notice that's required by the statute? Yeah. It has to give you a toll-free phone number and a fax number to direct an opt-out request. So I'm saying if you get one of those, is that in perpetuity or does that have to be renewed with new stuff? Or once they got it, you can send them anything you want. Is that too cluttered? No, no. I mean, once the sender gets permission, can they send as many as they want? Different things. You have to notify them every time you send it. Does the sender have to? No opting out. Yes, yeah, of course. It has to be on every fax advertisement because usually you get a junk fax. I think that's what Judge Manum has. Every time you send them a fax, you've got to tell them how to opt out. Yes, of course, yeah. It's not such a burden. I mean, it requires a clear and conspicuous opt-out notice, just like you need on pre-screened offers of credit under the Fair Credit Reporting Act or there are certain Truth in Lending Act requirements that require clear and conspicuous disclosures. It's not hard for these senders to do that. I see my time has expired unless there's any other questions. Thank you, Your Honor. Mr. Coyle? I want to get right to the last question that she asked. The Brodsky case completely rejected what counsel just told you. If you have an established business relationship, and what this court, two of the members of this panel decided in Brodsky, Brodsky admits that he had a market agreement and thus a pre-existing business relationship with Humana and that he expressly agreed in his market agreement that Humana could communicate with him by fax. He went on to say, we agree with the D.C. Circuit that at a minimum we reject the plaintiff's argument that the statute itself requires opt-out notices on solicited faxes. It does not. And nothing in Holtzman, the case they just cited to you, nothing supports engrafting such language on the statute. As the opening sentence of that opinion signals, the issue there had to do with unsolicited faxes. These are our customers. You're not getting spam phone calls about student loans and trips to Cancun. We have a relationship with these people, and this court has rejected the argument that counsel just made to you. We don't have to have an opt-out requirement. Mr. Coyle, briefly, what is the evidence that you would seek to present on the issue of consent? We tried to put in testimony from Mr. Moffitt, who explained how we got all their permission. No, I understand. And then we got a whole bunch of affidavits from our customers that said, yes, send us this information. You know, Your Honor, that's enough to get to the trial. No, no. So are you suggesting you have sufficient affidavit evidence that would be representative of the custom and usage in this unique circumstance as you described it? Yes. I think that we had enough here to get to. I mean, we're just trying to get to trial. We got derailed on the way, and the significance is, to answer your previous question, the TCPA does not come up with what constitutes permission or consent. That's a question of fact. Give me a chance. We can prove that because these are our customers, and this isn't spam email, and we never got the chance. And in all due respect to the judge, from August he said, this case is going to get resolved in December, and it was. We never got our day in court. We're entitled to a trial on these issues, and I think a jury is going to say everything we did is appropriate and we don't owe this $5.7 million. Was there any limitation on discovery during that relatively short period of August to December? Well, the problem with this is they dumped in all the evidence on the got put in on a reply brief the day before Thanksgiving. When we filed a motion the following Tuesday to submit a cert reply, his honor said, you're too late. I already entered my order. So we didn't, in all due respect, we didn't get a fair shake. We're entitled to a trial. It's a lot of money, and I think the fact finder is going to find that we don't owe this money, and we'd ask for that relief. So I'm going to ask you for three things. One, reverse and remand us back for trial and vacate this judgment. If you can't do that, then I think that you have to vacate the judgment and give us at least a hearing on damages, and the third thing is if you won't give us that, we need to put together a notice because this is a consumer statute, and it's not the person whose fax number gets the $500. It's the consumer, and at least the notice has to go out, and I know it's ten years ago to figure out exactly who got this fax, and we'd ask for that relief. Thank you, Your Honor. Thank you, Mr. Coyle. Thank you, Mr. O'Hara. Case is taken under advisement.